CONCEPCIÓN DE GOENAGA, Plaintiff and Appellee, *v.* LUIS and JOSÉ O'NEILL DE MILÁN, Defendants and Appellants.

No. 12020. Decided April 19, 1962.

164

*Juan B. Soto, Esteban Susoni Lens,* and *Benjamín Ortiz* for appellants. *Mariano Acosta Velarde* and *Daniel Pellón Lafuente* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered de opinion of the Court.

This is an action filed by the defendants for the specific performance of a contract of sale of a parcel of land situated in Hato Rey within the former Municipality of Río Piedras. The main point in dispute is whether at the time that the sale was executed—June 27, 1945—the land on the northern boundary of said lot had been actually urbanized to form a public street named "Street No. 5."

Concepción de Goenaga alleged in her amended complaint, in brief: that in the year 1945 the defendant brothers Luis and José O'Neill de Milán were owners of a lot situated in Hato Rey with an area of 5,927 square meters and which was recorded in the Registry of Property of Río Piedras "as a development known as 'Garden City,' divided into blocks, streets and lots, all in accordance with a development plan made by the surveyor Carlos Castro Martínez and approved by the Department of Health on November 12, 1926"; that on June 27, 1945 the defendants segregated from said property a lot which they sold to the plaintiff and which is described thus:

"URBAN: Parcel of land consisting of 1465.22 square meters with the following boundaries: on the north, along 36.90 meters *by proposed Street No. 5 of this development;* on the south, along 37.50 meters by O'Neill Street (formerly Street No. 1); on the east, along 38.50 meters by the main property; and on the west, along 40.50 meters, by proposed Street No. 4 of this urbanization." (Italics ours.)

Plaintiff further alleged that in said parcel she caused a one-story concrete building to be built in which she established her needlework shop, "said building having been designed and constructed with a view to the northern, southern, and western boundaries of the lot purchased from the de-

fendants with streets numbers 5, 4 and O'Neill"; that Street No. 5, the northern boundary of the lot, "has always been open to public traffic and has always been used, considered and regarded by plaintiff, as well as by the community, as a public thoroughfare of said development 'Garden City,' and according to the plan which was shown to the plaintiff and by virtue of which she made the purchase"; that the defendants in order to deprive the public in general and particularly the plaintiff of the use and enjoyment of said Street No. 5, and in violation of the contract of sale, maliciously and wilfully went to the Planning Board and behind plaintiff's back requested the subdivision of the remainder of the property, without notifying said Board of the sale that they had made to the plaintiff and particularly the fact that Street No. 5 was bounded on the north by the parcel that they sold to her, alleging falsely before the Board that the remainder of the property was bounded on the south "in part by lands belonging to the plaintiff instead of by Street No. 5"; that without summoning or hearing the plaintiff the Board on March 18, 1953 approved the subdivision of the remainder of the property into two lots, one of 1820.289 square meters, marked letter "A" and the other of 1118.675 square meters, marked letter "B"; that the defendants sold lot "B", the northern boundary of which was not the remainder of the property but Street No. 5, and that they proposed to sell lot "A" which is not bounded by plaintiff's parcel of land but by said Street No. 5; that codefendant Luis O'Neill de Milán for himself and as agent of his brother José had informed the plaintiff "that Street No. 5 had been eliminated and that neither she nor the public in general were entitled to go through or use said street as a public thoroughfare and that they have objected and object to having plaintiff construct a sidewalk along the northern boundary of plaintiff's property, that is, the southern sidewalk of Street No. 5," thereby violating the contract of sale, preventing her from freely using said street

and as a way of communication or traffic and as a servient tenement of light, view, air, and right of way, constituted on the property of the defendants and in favor of plaintiff's property, which has lost in value and causing her a considerable reduction in her business, the damages of which are estimated in at least $15,000.

The plaintiff prayed for judgment with the following specific pronouncements: (1) decreeing that plaintiff's parcel of land is bounded on the north by said proposed Street No. 5; (2) decreeing that the new parcels "A" and "B" are bounded on the south by Street No. 5; (3) ordering the registrar to enter said boundaries; (4) ordering the defendants to enjoin from selling parcel "A" without mentioning that it is bounded on the south by Street No. 5; (5) forbidding the defendants from eliminating Street No. 5 and to appropriate said strip of land for themselves; (6) decreeing that the remainder of the property was subject, insofar as Street No. 5 under project is concerned, to a servitude of right of way, air, light and view in favor of plaintiff's property and to so enter it in the registry of property; and (7) that the defendants be ordered to pay $15,000 for damages if it is proved that they had sold to third persons the whole or part of the remainder of the main property or if for any reason the defendants are not able to comply with the terms stipulated in the deed of sale executed between plaintiff and defendants.

The defendants answered the amended complaint accepting some of the averments stated therein and denying others, particularly the real existence of the development "Garden City" and of Street No. 5. Their third and fourth defenses are as follows:

"Third Defense.—

"1. In the year 1932 the development plan made by surveyor Carlos Castro Martínez and approved by the Department of Health of Puerto Rico, to which plaintiff refers in paragraph 3 of the amended complaint, was eliminated by virtue of the provision of § 4 of Act No. 11 of April 11, 1931.

"2. Twelve years later, that is in 1945, the defendants having failed to do any work in the aforesaid development and having desisted from carrying it out, agreed to execute and did execute before Notary Rafael R. Fuertes, deed number 11 of June 27, 1945, with a view to consolidating into a single property the lots laid out in the plans of the aforesaid development, and in order to carry out said purpose the defendants expressly stated in said deed that they eliminated the aforesaid urbanization or subdivision of lots, reconsolidating them into a single property which is described as follows:

'RURAL: lot of five thousand nine hundred twenty-seven square meters, bounded on the north, along one hundred and four meters, by railway of the American Railroad Company which leads from San Juan to Carolina, bounded also along thirty-five meters, by lands of Luis Ocasio, formerly Juan B. Huyke; on the south, along one hundred thirty-six meters, by O'Neill Street, formerly Street number one of this development; on the east, along forty-eight meters, by street number six of this development, formerly lands of Catalina Lefebre, and along twenty meters by lands of Juan Pacheco Tavares, formerly Mr. Hutchinson; and on the west, by land of Martín Martell, formerly street number two.'

"3. Having thus desisted from carrying out said urbanization and having consolidated the lots (of which it would have consisted, if developed) into the property described in the preceding paragraph, the defendants undertook to segregate from said property and did segregate therefrom a parcel of land consisting of 1465 and 22 hundredths square meters; which for the purpose of its identification is described with the following boundaries:

'On the north, along thirty-six meters and ninety centimeters by proposed street number five of this development; on the south, along thirty-seven meters and fifty centimeters by O'Neill Street, formerly street number one of this development; on the east, along thirty-eight meters and fifty centimeters by lands of the vendors; and on the west, along forty meters and fifty centimeters by street number four under project of this development.'

"4. Inasmuch as the streets mentioned in the description of the segregated lot do not appear and cannot appear constructed or laid out on the land, because the development was never

carried out, and because further, the permit granted by the Health Department extinguished by operation of law, the defendants, for a better identification of said parcel, stated in the deed that the streets mentioned in the description thereof are designed in the aforesaid plan made by surveyor Carlos Castro Martínez.

"5. Said development having been eliminated and the lots having been reconsolidated into a single property, and the segregation of said parcel having been made, the defendants proceeded to sell to the plaintiff, who purchased it, the segregated parcel of land for the price of $4,395.66; the plaintiff knowing that said development had been eliminated and that said street number 5 had never been constructed, nor laid out on the ground and that it had only been designed on the plan of the extinct development.

"6. The aforesaid street number 5 could not be constructed, even if the defendants wished to do so, without the permission of the Planning Board of Puerto Rico; which, the defendants allege, had stated its objection to the construction of said street because in its opinion and according to the best technique of development, the construction of said street would seriously affect the best urban development of the area where it was to be constructed.

"Fourth Defense.—

"The property or parcel sold by the defendants to the plaintiff was not, at the time of the sale, nor is at present, situated among other parcels belonging to the vendors; but it is adjacent to several public thoroughfares."

At the preliminary hearing it was agreed "to limit the case to determining whether in the parcel of land purchased by the plaintiff from the defendants there is established in its favor a servitude of right of way, light and view mentioned in the amended complaint, and if so, to determining the amount of damages suffered by the plaintiff in case the defendants should fail to establish said servitude."

The case went to trial. Both parties introduced oral and documentary evidence. An inspection was made. The case was decided in favor of the plaintiff, the trial judge having made a lengthy statement of the case with its findings of fact

and conclusions of law. The judgment declared the existence of a "servitude of right of way, light, air and view" on a strip of land of 63.901 meters long by 13 meters wide—that is 830.713 square meters—which extended from east to west from Muñoz Rivera Avenue (formerly, and in part, street six of the proposed development) up to Street No. 4 and across parcel "A" of 1820.289 square meters property of the defendants, as a servient tenement, and in favor of the parcel of land belonging to the plaintiff as dominant tenement; it ordered its registration in the registry of property and, furthermore, ordered the defendants to pay costs and attorney's fees.

The defendants appealed to this Court. The parties submitted the appeal on their lengthy and elaborate briefs in which they skillfully argued the different points assigned by each party.

The appellants allege that seventeen errors were committed in the findings of fact and ten errors in the conclusions of law. With the exception of the first three findings of fact they specifically challenged each finding. At times their tone of expression is so violent that we disapprove of the same.[1]

---

[1] At page 4 of their brief they allege, in part, as follows:

"And on May 5, 1955 the superior judge renders a judgment in which he dispossesses the defendants-appellants of land legitimately belonging to them, which he arbitrarily grants to the plaintiff-appellee.

"An appeal is taken before this Honorable Court, therefore, from a judgment that is vitiated by partiality and prejudice, a judgment that is unsound, ignorant, lacking the minimum jurisprudential support to bear down on the defendants-appellants a maximum sentence; a judgment that is contrary to the facts, in which the superior judge presents as 'Conclusions of Fact' false allegations of the plaintiff-appellee and establishes as 'Conclusions of Law' at times inferences from those same false facts, and at other times illogical interpretations of the Law and Authorities.

"We appeal to this Court from a judgment that is frankly alarming, because it tends to destroy the faith of the citizens in the peaceful procedures of justice and in the efficiency of the judicial proceedings."

The analysis and study which we have made of the conclusions of the trial court and of the issues involved in the appeal, in the light of all the facts and surrounding circumstances and of the legal provisions applicable to the case, have produced in us the firm and conclusive conviction that the principal determinations—even if we accept that they are supported by the evidence admitted or authorized by some plausible interpretation of law—do not represent, for the reasons we shall hereinafter set forth, the most rational, fair and juridical balance in the determination of the case, and that, for that reason, they are clearly and manifestly erroneous, warranting the reversal of the judgment appealed from.

In stating our reasons we shall follow the same order established by the parties in the discussion of the questions in dispute, considering as a whole, at times, the issues raised.[2]

## I

The first five assignments of error are directed against findings of fact numbered 4, 5, 6, 7, 8, and 9, which read thus:

"4. Property No. 4996 of the defendants and acquired from Juan B. Huyke was developed by the defendants according to plan of September 14, 1926 by engineer C. Castro Martínez.

"5. The defendants called this development 'Garden City.'

"6. On October 7, 1926 the Municipal Assembly of Río Piedras, P. R., gave its approval to the development 'Garden City.'

[2] The appellants do not attack the first three findings of fact which we copy below for a full understanding of the case:

"Findings of Fact

"1. The defendants [Luis and José O'Neill de Milán] acquired from Juan B. Huyke and his wife Carmen Colón, a parcel of land of 5927 square meters recorded at folio 195 of volume 96 of Río Piedras, property No. 4996, first inscription.

"2. The parcel acquired by the defendants from Mr. Huyke is described in deed No. 11 of June 27, 1945, executed in San Juan, Puerto Rico, before Notary Rafael R. Fuertes, divided into 10 lots numbered from 1 to 10, with different areas, but all extending from north to south and bounded on the front along 12 meters by Street No. 1.

"3. The aforesaid Street No. 1 is today O'Neill Street."

"7. On November 12, 1926 the Insular Government, through its Department of Health, approved the development 'Garden City.'

"8. Property No. 4996 of the defendants, that is, development 'Garden City,' *according to the development plan*, consisted of the following blocks, lots and streets:

"Block 'B' having an area of 2417.72 s/m divided in 10 lots and bounded on the north, by street No. 5; on the south, by O'Neill Street, formerly street No. 1; on the east, by street No. 6, and on the west, by street No. 4.

"Block 'C' having an area of 1492.38 s/m divided into five lots, said block 'C' bounded on the north, by the railway of the American Railroad Co. of Puerto Rico; on the south, by O'Neill Street, formerly street No. 1; on the east, by street No. 4, and on the west, along 19.10 meters by street No. 3.

"Block 'D' having an area of 1013 square meters divided into 4 lots all of them bounded on the south by street No. 5.

"9. Street No. 5, having a length of 63.30 meters by 10 meters wide and 1.50 meters on each side for sidewalks, separates block 'B' from block 'D' and it extends from east to west connecting streets No. 6 and No. 4." (Italics ours.)

Appellants also attack the following conclusions of law sequel of the findings copied above:

"The court is of the opinion that the development Garden City made from property No. 4996 by the defendants, since it was approved on October 7, 1926 by the Municipality of Río Piedras, today Capital of Puerto Rico, within which municipality the property is located, having been also approved by the Insular Government on November 12, 1926, said development is governed by the provisions of Act No. 69, approved by the Legislative Assembly of Puerto Rico on August 3, 1925 (Sess. Laws, p. 366).

"The court is of the opinion that once the development Garden City was finally approved by the Insular Government and by the municipality, street No. 5 as well as all the streets of said development became the property of the Municipality of Río Piedras, today of the Capital of Puerto Rico, pursuant to the provisions of § 3 of Act No. 69 of 1925, as well as pursuant to the interpretation given to said Act by our Supreme Court in Zayas *v.* Planning Board, 69 P.R.R. 27."

The evidence introduced at the trial does not warrant nor does it constitute or offer any basis of fact or of law to conclude that the O'Neill brothers had urbanized the parcel land of 5927 square meters prior to June 27, 1945 under the name of "Garden City Development" or under any other name, and much less that the so-called Street No. 5 came "to be the property of the Municipality of Río Piedras."

From the documentary evidence itself presented by plaintiff the following appears:

In 1926 Juan B. Huyke and his wife Carmen Colón were owners of a parcel of land of 66,231.53 square meters located in Hato Rey. Under No. 977 they recorded the property in the registry of property.

Without having yet acquired any title on part of that land belonging to the spouses Huyke-Colón, the O'Neill brothers, defendants-appellants herein, together with Alejandro Rodríguez, commissioned surveyor C. Castro Martínez on that year to prepare a plan for the construction of a development that would bear the name of "Garden City" of "Rodríguez-O'Neill, Hato Rey, Río Piedras." The lands to be developed consisted of a parcel of land measuring 18,137.19 square meters, located on the west of the former Carretera Central, between Santurce and Río Piedras, today part of Ponce de León Avenue. Its principal entrance and exit was a straight strip of land which crossed from east to west, starting from the former Carretera Central, which was finally known as "O'Neill Street."

On September 14 the plans were completed. Pursuant thereto, the lands contributed by the O'Neill brothers were about 6,463.73 square meters and were situated north of O'Neill Street; the lands were divided into blocks "B," "C," and "D". The first of these blocks, which has an area of 2417.72 square meters, was subdivided into ten lots, the largest one measuring 281.44 square meters and the smallest

one 213.75 square meters; four of them were bounded on the north by "Street No. 5" laid out in the plan and which occupied about 615.10 square meters of land, having a length, on the southern side, that is, the northern boundary of the four lots, of 61.90 meters and 10 meters wide. The length on the northern side of that street was shorter than on the southern side. Street No. 5 was laid out as connecting street number 6 of the map with street number 4, which would run from south to north.

Pursuant to Act No. 69 of August 3, 1925,[3] the map was submitted to the Municipal Assembly of Río Piedras for study and approval. The assembly approved it on October 7, 1926.[4]

---

[3] The first three sections of the Act provide:

"Section 1.—That whenever it is intended to urbanize land contiguous to the cities or towns of the Island of Porto Rico, the plans relative to such urbanization, before their approval by the Insular Department of Health shall first be submitted to the municipal assembly of the respective city or town for study and approval.

"Section 2.—The municipal assembly shall approve or disapprove such urbanization as may be submitted to it, where the welfare of the community and local circumstances shall so require; but if after any plan of urbanization is submitted to an assembly, one year shall elapse without the assembly taking any action either for or against it, such fact shall be deemed an approval of the said urbanization, and a certificate of the municipal secretary to that effect shall be sufficient for the respective Insular Department to proceed to the final approval of the proposed urbanization.

"Section 3.—When such urbanization is finally approved by the Insular Government and the municipality it shall be understood that the same becomes part of the town, and the maintenance of the streets and other public services shall be in charge of and shall become the property of the municipality concerned."

[4] Insofar as pertinent the Minutes corresponding to this approval read as follows:

"7. The report of the mayor in connection with the 'Floral Park' development in Hato Rey which has presented its plans for approval has been read and it was agreed to approve said plans, as well as those presented by Mr. Arturo González to develop a parcel of land in Hato Rey at stop 35, the plans presented by Mr. Luis Rexach in the name of Valdés, Cuyar & García, to develop lands at stop 27, Martín Peña, and those presented by O'Neill & Rodríguez, for another development at stop 30 in Hato Rey."

Seven days later the contractor Luis Rexach sent the aforesaid plan to the engineer of the former Insular Department of Health for its approval.[5] On November 12 of the same year that department also approved it.

By March 7, 1927 nothing had been done in connection with the proposed "Garden City" development; the O'Neill brothers had not even acquired written title on the parcel of land of 6463.73 square meters to be developed in their name pursuant to the approved plans. At that time a deed was executed before Notary Bolívar Pagán by Juan B. Huyke and his wife and the O'Neill brothers by virtue of which the former segregated from their property No. 977 a parcel of land measuring 5927 square meters, the southern boundary of which was the aforesaid O'Neill Street, formerly Street No. 1, measuring in the front 136 meters. The segregated parcel was subdivided into ten lots, all of them fronting or having an entrance on the south and on O'Neill Street and bounded on the north by the main property and by lands of the railroad company. The largest parcel had an area of 1096 square meters and the smallest one measured 216 square meters. This parcel of 5927 meters, which was subdivided into ten lots, was sold by the same document to the O'Neill brothers.

---

[5] The letter sent reads as follows:

"Mr. Luis Rexach, Contractor & Builder, Exclusive Agent in Porto Rico for Milliken Brothers Mfg. Co., Office at Martín Peña, San Juan, P.R.—October 14, 1926. Mr. Health Engineer, San Juan, P.R. (Through the Local Head of the Health Department of Río Piedras.)

"Sir: I attach herewith three copies of a development plan of certain lands at stop 29 in Hato Rey belonging to Messrs. Alejandro Rodríguez and Luis O'Neill. This plan was presented to the Municipal Assembly of Río Piedras and approved by the latter on the seventh of the current month, according to a certificate attached to the drawings which I enclose. The work which is to be accomplished includes streets of 10 meters wide, leaving 1.50 meters on each side for sidewalks. Curbs and gutters in concrete 60 cms. wide. Water installation in all the streets directly connected to a 20" pipe of the main highway. Macadam pavement of 0.25 meters thick and asphalt. —Very truly yours (signed) Luis Rexach."

It was recorded in their name in the registry of property under No. 4996 and with the following general description:

"RURAL: lot consisting of five thousand nine hundred twenty-seven square meters, bounded on the north, along one hundred and four meters by the railroad of the American Railroad Company which leads from San Juan to Carolina, also bounded along thirty-five meters by lands of Juan B. Huyke; on the south, along one hundred and thirty-six meters by street number one which shall be opened in this development at any time before making full payment of the land; on the east, by lands of Catalina Lefebre, along forty-eight meters, and along twenty meters by land of Mr. Hutchinson; and on the west, by street number three which shall be opened in this development."

It is stated that it is subdivided into ten lots, the individual description of each lot being given upon recording the sale in the registry.

Undoubtedly, the land which was to be contributed by the O'Neill brothers in the year 1926 to be developed together with that of Alejandro Rodríguez, under the name of "Garden City," with a little less area, was the same land purchased from Mr. Huyke in March 1927. But they did not submit, at any time subsequent to its purchase, a new development project to the Municipal Assembly of Río Piedras nor to any other agency, nor did they record in the registry land which they might have urbanized under the name of "Garden City Development." See Defendants' Exhibit 7.

More than four years elapsed after the approval of said map without the O'Neill brothers having begun any work in said project. In this situation, on April 11, 1931, Act No. 11 was approved "prescribing a permanent procedure for the urbanization of lands in the cities and towns of the Island." Pursuant to § 11 thereof "Act No. 69... approved August 3, 1925 is hereby repealed." In the "Provided" clause of § 4 it is provided:

"... *Provided,* That any urbanization, or part of urbanization, approved prior to the effectiveness of this Act, shall be finished within the said period of one year from the date of approval of this Act. *If said periods of one and two years should lapse before the urbanization is finished, the permit shall be void and of no effect."* (Italics ours.)

■ After the approval of that Act, the O'Neill brothers never commenced, nor attempted to commence, the works designed in the plan approved by the Municipal Assembly of Río Piedras and by the Insular Department of Health in the year 1926 for the construction of the "Garden City" development. Thus, after April 11, 1932, the permits granted by those two agencies to construct the development became void and without effect.

■ Although the project for the construction of the "Garden City" development was prepared in 1926 and the approval of the plans obtained, the construction was never commenced. A development that had never been constructed could not "be finally approved" by the insular government nor by the Municipality of Río Piedras; nor could streets that had never been constructed be maintained or become the property of the municipality.

■ The mere approval of a plan could not mean that the land offered for streets, as they appeared drawn in the plan, would become the property of the Municipality of Río Piedras, and, much less if the alleged urbanizers lacked the written title over that land and if, after that approval, title of its acquisition is granted and the land is subdivided into ten lots entirely different from the nineteen lots of the 1926 plan, eliminating from the general description of the parcel of land and from the individual descriptions of the lots "street No. 5" as drawn in the plan.

■ At the time of the approval of the plan, Act No. 69 of 1925, insofar as pertinent, provided as follows:

"When such urbanization is *finally approved* by the Insular Government and the municipality it shall be understood that the

same becomes part of the town, and the maintenance of the streets and other public services shall be in charge of and shall become the property of the municipality concerned." (Italics ours.)

■ The final approval of an urbanization can not take place where such urbanization has been planned but not constructed. The construction of an urbanization can not be regarded as finally approved where not even a single meter of land has been developed. As appellants correctly set forth in their brief: "With the exception of O'Neill Street, Garden City Development never passed the stage of the approval of the plan, ...";[6] in other words, it never went beyond the necessary permits to begin the construction.

■■ Act No. 213 of 1942 creating the Planning Board— approved three years before plaintiff purchased from the

_____

[6] Passing on the obligation of an urbanizer to pave with asphalt the sidewalks, curbs and gutters of certain streets which are urbanized since 1928, we said in *Zayas* v. *Planning Board*, 69 P.R.R. 27, 31 (1948):

"As to the second part of this assignment, in which it is urged that error was committed in requiring the minimum facilities for streets Nos. 1, 2, 3, and 4, we agree with the petitioner, and we are of the opinion that the Board lacks power to impose that requisite. Said streets were urbanized and accepted as such by the Municipal Government of Adjuntas since the year 1928. From that time onward, the petitioner had no authority or control over said streets. This is shown by a certificate which forms part of the record and which was issued by the municipal secretary of the above-mentioned town in the year 1928, attesting that: 'The Assembly unanimously agrees to accept and finally receive Attorney Zayas Pizarro's urbanization, situated in the ward of Pueblo, Adjuntas, eastern end of Rodulfo González Street, *as to the four streets which he has already completed*, which streets hereby become part of the town limits or urban zone in accordance with the law, and the interested party can now proceed to build such houses as he may deem proper on the said four streets, subject to the final approval of the Department of Health and to the obtention of the permits required by the laws and the regulations relating to such constructions.' The record also contains an official letter written by the Department of Health in the year 1928, which in its pertinent part reads as follows: '*After an inspection* made by the Assistant Engineer, Mr. Oliver, of the lands of the urbanization owned by you, situated in the Municipality of Adjuntas, I am pleased to inform you that since streets Nos. 1, 2, 3, and 4 *have been paved and constructed in accordance with* the *plans ap-*

O'Neill brothers part of their land—provides in its § 11 that the making or approval of an official map "shall not, in and of itself, determine the construction of any road or street or the taking or acceptance of lands for such road or street purposes." Regulation No. 3 of the Board, in force since September 4, 1944—also a date prior to the purchase—provides in its article 20 that the streets of urbanizations shall have "the legal status of public streets" and shall become public property "after the Record Plans have been approved and registered, *and all streets and other site improvement works have been completed.*" (Italics ours.)

In *Benet v. Registrar*, 65 P.R.R. 460 (1945), we applied § 11 of Act No. 213 and we held that a report issued by the Planning Board authorizing certain subdivisions, in which it is stated that a Master Plan for Major Thoroughfares adopted by said Board includes a highway which is planned along the sections where the lots involved in said subdivisions are located, does not constitute any title of servitude of right of way nor does it have the effect of creating any easement which may be subject of an entry in the registry in connection with the recording of the subdivisions.

In view of the foregoing, findings 4, 5, 6, and 7 and the resulting conclusions of law [7] are clearly erroneous.

We find correct finding of fact No. 8 in which it is determined that Garden City Development "according to the development plan, consisted of the following blocks, lots and

*proved* by the Department, the said streets are hereby accepted for the purpose of building thereon.'" (Italics ours.)

We may state that pursuant to Act No. 69, as we partially construed it there, for an urbanization to be considered as part of a town and its streets as property of the corresponding municipality it was necessary that it have: (a) the previous approval of the plan by the Municipal Assembly and by the Insular Department of Health; (b) construction and termination of the streets in conformance with said plan; (c) verification by the personnel of the "Insular and Municipal Governments" that said streets were constructed and completed in conformance with said plan, and (d) final approval by both governments.

[7] The trial court did not enumerate its conclusions of law.

streets: . . ." A mere glance at the abandoned plan of 1926 —plaintiff's Exhibit 3—proves that it is true that "according to the plan" the proposed development "consisted" of blocks, streets and lots mentioned in said finding. This is but a mere reference to the plan of 1926, not a direct or indirect determination that that urbanization was actually constructed.

Finding 9, which indicates the length and width of the proposed Street No. 5 is clearly erroneous. According to the lay-out in the plans its length would be 61.51 meters, not 63.30 meters as stated by the trial judge in that finding; its total width, including the area for sidewalks, would be 10 meters, not 13 meters as stated by the judge, apparently attributing 10 meters to its traffic zone and "1.50 meters on each sidewalk." Its area would be 615.10 square meters as stated in the plan, not 822.90 which is the sum of the dimensions given in the finding of fact. —Notice the "Cross-Walk Section of the Streets" drawn on the left-hand side of the plan and see the letter of Mr. Rexach copied in note 5.

## II

The sixth, seventh, eighth, ninth, and tenth assignments of error attack findings of fact numbered 10, 11, 12, 18, 19, and 21 and the corresponding conclusion of law, which read thus:

"10. Since 1928 the defendants leased for the construction of houses the four lots of block 'D' fronting Street No. 5.

"11. The lessees of the lots in block 'D' built frame houses on each one of said lots, some of them having concrete foundations and stairs as well as public service of either aqueduct and lighting.

"12. Although said houses were constructed within the leased lots of block 'D' they were not built in a straight line with Street No. 5, but in an irregular line fronting said street.

"18. The defendants requested the Planning Board to allow the subdivision of their property No. 4996 for the purposes of the lot segregated for the plaintiff and said Board, by report

L-692 of March 8, 1946, approved the segregation and for the purpose of its registration in the Registry of Property it described the lot acquired by the plaintiff in the following manner:

"URBAN: Parcel of land consisting of 1465.22 square meters bounded: on the north, along 36.90 meters, by Street No. 5; on the south, along 37.50 meters, by O'Neill Street (formerly Street No. 1); on the east, along 38.50 meters, by the main property; and on the west, along 40.50 meters, by Street No. 4.

"19. Although the lot of 1465.22 square meters acquired by the plaintiff was formed with part of lots 4 and 5, as well as with the whole of lots 6, 7, 8, 9, and 10 of block 'B' of Garden City Development, the defendants accepted and confirmed the existence of said development in fixing, as boundaries of the lot sold, streets Nos. 5, 4, and O'Neill, which together with Street No. 6 formed the boundaries of block 'B'.

. . . . . . . .

"On June 27, 1945, the date when the plaintiff purchased her lot, the land of the streets of Garden City Development was municipal property. Streets Nos. 5 and 6 as well as O'Neill Street were open to public traffic. Houses had been built in all the lots of block 'D' with their front to Street No. 5, for which reason the court finds that said Street No. 5 was urbanized at the time plaintiff acquired her lot. It is a known fact that for a street to be used by the purchasers of the lots, according to a development plan which lays it out and leaves the land free for public use, it is neither required nor necessary that said street be paved or provided with gutters and sidewalks, it being sufficient if the land is there and it is used as a street by the purchasers of the lots. (See the ruling of the Supreme Court in *Capella v. Carreras*, 57 P.R.R. 250)."

The evidence taken as a whole does not support, in its essence, those findings. It showed that after the San Felipe hurricane a small slum consisting of a group of some five or six frame houses began to be built and was actually built on the northern part of the parcel of land of the O'Neill brothers, and that those houses stood on part of the lots which according to the 1926 plan would form "Block D" of the proposed development, or part of the ten lots into which their parcel had been divided when it was acquired in 1927;

they were not built in a straight line of construction; some of them had concrete foundations and stairs; the occupation of that land by those persons was due largely to previous relations between them and the O'Neill family who consented and tolerated, after the San Felipe and San Ciprián hurricanes, that poor people should occupy part of the land as a "place of refuge." The defendants charged a small monthly rental to some of the owners of those houses for being on their land; shortly after the lot was sold to the plaintiff all those houses, with the economic aid of the O'Neill brothers, were removed from said parcel to other land; water service— a water tap—and the lighting furnished to that small slum had been brought there by initiative of the owners of those houses; part of one of those houses, its latrine and pigeon house, all belonging to Guillermo Martínez, were precisely constructed within the strip of land which would have become Street No. 5 if Garden City development had been constructed—see photograph Exhibit I of the defendants—the O'Neill brothers, up to the time of the sale to the plaintiff, had not performed any work of development in their parcel of land; not even the so-called streets had been laid out on the ground; the unoccupied portion of the land was planted with fruit trees, bananas and some vegetables—as to the grown trees see the photographs Exhibits 8a, 8b, and 8c, and 9a, 9b, and 9c of the plaintiff —; several trails had been formed to connect the houses with each other and were used as walking paths to go from the group of houses to O'Neill Street, crossing the land which later in 1945 was sold to the plaintiff; that parcel of the O'Neill brothers consisted mostly of swampy land which caused the formation of small puddles or water deposits over which the owners of those small houses and their relatives had placed long boards to maintain the traffic between the group of houses and O'Neill Street; the houses were not built fronting any street because their construction did not follow the abandoned plan of 1926, and as

a matter of fact, streets Nos. 5 and 6 which had been drawn in that plan did not exist, but only the trails. The so-called Street No. 4 was made after August 4, 1949 by residents Isabel Piñeiro de Olivar, Monserrate Rosa and Diego Domínguez. The turning area shown in Photograph Exhibit I of the defendants was also made by those residents.

Those facts could never constitute appropriate premises to conclude (1) the existence of said streets, (2) that they "were municipal property," (3) that they were open to public traffic, (4) that the houses had been built in all the lots of block 'D' fronting Street No. 5 laid out in the plan.

Our decision in *Capella* v. *Carreras*, 57 P.R.R. 250 (1940), cited by the trial judge, has no application to the case at bar. That case was an action for the abatement of a nuisance obstructing the right to use a street actually existing and which was part of a subdivision actually developed in accordance with a development plan and which was used by several purchasers of lots of said development and residents thereof. See the facts of said case as they were set forth in *Capella* v. *Carreras*, 48 P.R.R. 811, 814 (1935), in which, among other things, we said:

"There is evidence in the record tending to show that the tract was improved and its streets dedicated to the public use and delivered to the Municipality of San Juan."

The continued existence of that small slum, the failure to lay out the streets, the presence of the latrines and pigeon houses, and the fact that part of a house occupied the strip of land which was once drawn on a plan as Street No. 5, constitute a clear demonstration that the proposed development of the parcel of land of the O'Neill brothers was never accomplished. Those circumstances fully justified a negative determination of the existence of the so-called "Street No. 5."

The status of that parcel of land in the registry of property on June 27, 1945, according to defendants' Exhibit No.

7—consisting of a petition for a certificate addressed to the Registrar of Property and the certificate issued by the latter—was the following: that at that time, and prior thereto, the property appeared in the registry "divided into ten lots marked from One to Ten inclusive and separately recorded in said first inscription" and that there was no showing that "said property was identified with the name of Garden City or with any other name and it does not appear divided into blocks or streets."

That day deed No. 11 for "Reconsolidation and Sale of Land" was executed before Notary Rafael R. Fuertes by the O'Neill brothers and their wives and plaintiff. In the recital of the deed the former stated that they were the owners of a parcel measuring 5927 square meters, giving to that property the same original general description that had been given to it when they acquired it in March 1927, and which appears on *ante*, p. 176. It is stated that the parcel was divided into ten lots to which the registrar's certificate refers. The O'Neill brothers eliminated in said deed the former division of the parcel into ten lots and reconsolidated them in the following terms:

### "RECONSOLIDATION OF LAND

"FOURTH: Luis O'Neill de Milán and Josefa Calzada, the former in his personal and representative capacity and the latter in her own right, further state *that they wish to eliminate the division of the parcel of land previously described in the lots in which they were divided,* and it is their intention to reconsolidate all of them into a single property, the description of which is as follows:" (Here follows the same original description of 1927 with slight variations). (Italics ours.)

After having made the reconsolidation of those ten lots which extended from the same southern boundary line of the parcel, that is from O'Neill Street to the same northern boundary, without there existing any streets within that area (and which should not be mistaken in any way with the 19 lots of the extinguished plan of 1926), the O'Neill brothers

segregated from the parcel thus consolidated a lot measuring 1465.22 square meters which they sold under the same deed to the plaintiff and the northern boundary of which appeared thus: "on the north, along thirty-six meters and ninety centimeters by proposed street number five of this development..." when it was actually the main property. And thus, improperly, because of lack of due care in the description of the segregated lot and because of incorrect expressions repeated in the deed concerning the original description of the main property, which was not described after the segregation, there was cause for what eight years later constituted the ground of the present suit. We say improperly because in the year 1945 proposed Street No. 5 was not even in existence, nor did there exist what was designated in the deed as "this development," as shown by the evidence introduced. Those streets appeared in the 1926 plan, as stated in the deed itself, but without indicating that that plan had been annulled by Act No. 11 of 1931, and, prior to said Act, because the property had been subdivided by its former owner Mr. Huyke into ten separate lots, according to the registry, without there appearing in this subsequent division of the aforesaid plan neither street number five nor the name of the Garden City development. Neither this Act of 1931 nor the records of the registry on June 27, 1945, could be disregarded by the executing parties nor by the notary who attested the document.[8] The plaintiff took possession of the

---

[8] Quite properly, in our opinion, this error was attributed to the notary who authorized the deed of reconsolidation, segregation and sale. One of the distinguished attorneys of the plaintiff, upon arguing the admission of a certificate from the registry of property with respect to this unfortunate error, spontaneously, during the trial, expressed himself thus:

"Now, *an error was committed there—because in truth it is an error—it is an error, in my opinion, of the notary* in stating, unless he did so for identification purposes, in stating that that parcel was bounded on the north by such and such street (street No. 5) and on the south by such and such proposed street, *because in the deed there was no division of that large parcel into streets and lots.* Your Honor knows that to be logical the large parcel should have been divided into blocks and streets and lots, *but it does not appear from*

lot of 1465.22 square meters and in 1946 constructed her building for the needlework factory with free and ample exits to O'Neill Street, on the south, and towards what later became the so-called street number four, on the west. Until 1953, the situation of the proposed street number five remained the same: It had not been laid out on the ground, nor opened to the public, and part of the house, the latrine, and pigeon house of Guillermo Martínez continued located thereon. The plaintiff had not requested until then, that is, for a period of eight years, the O'Neill brothers to lay out, construct and open to public traffic the proposed street number five, nor that the obstacles kept there by Guillermo Martínez be eliminated.[9] Nor did she use it as the entrance to or exit from her property.

In 1949 Mrs. Goenaga and codefendant Luis O'Neill conferred as to the purchase of some additional meters of land. On July 18 of that year she wrote a letter which reads:

My dear Luis:

Today I received your letter of July 7. This week I am exceedingly busy with the insular as well as the federal income

---

*said deed that the big parcel had been divided into blocks, streets and lots.* Then, of course, the segregated parcel could not be divided into blocks and streets and lots. It did not exist for the purposes of that deed, and that is the juridical point." (Tr. Ev. 46, Stenog. Salas.)

The error in fixing the northern boundary is repeated when an explanatory deed is executed by the parties, before the same notary, on the following July 6, for the purpose of stating that when the Planning Board authorized the segregation it imposed the condition that is inserted in the explanatory deed prohibiting any construction at a distance of less than four meters from "the present curb, north of O'Neill Street."

And it was repeated again when in 1946 the Planning Board made its report stating that that segregated lot was bounded "on the north, along 36.90 meters, by Street No. 5"—plaintiff's Exhibit No. 6.—According to plaintiff's Exhibit No. 12, the error was due to the fact that the Board took the description of the segregated parcel from those deeds.

[9] Finding No. 25 reads, in part, thus: "... the court having noticed in its inspection that in part of the land devoted to Street No. 5 and near its intersection with Street No. 4, there remained the ruins of a latrine of the house of Guillermo Martínez, and that the aforesaid house was constructed on the premises of plaintiff's lot at the time she acquired it."

tax, but next week we can measure the land on whatever day and time is most convenient to you. Let me know in advance the day and time so that I can get someone to stay with the person you send; you can be sure that it shall be measured in conformance with your letter.

Thank you very much for being willing to sell to me the additional meters I want. You will let me know so that we can come to an agreement.

Luis, you know that I have always been interested in your land and that if I did not buy them when you sold me my lot was because your wife Pepita wanted to keep the land for you and some relatives; therefore I would appreciate it if you would give me first option of purchase; you know very well that you and I have always come to terms. I would regret very much to have other neighbors other than yourselfs, since I had always the illusion that you would live next to me some day.

I do not call on you personally because my time is short for everything I have to do; you will understand how busy and worried I am; so I trust in our friendship that you will give me an opportunity.

My regards to Pepita, your daughters and I remain, sincerely yours, (sgd.) Conchita Goenaga.

Notwithstanding mentioning the sale of the lot, and notwithstanding having announced by letter of the 7th of the same month of July 1949 that "I was thinking of putting on sale the lot adjacent to the one you purchased from us—plaintiff's Exhibit 15—nothing is said with respect to the lay out, opening and use of the proposed street number five.

### III

The eleventh assignment of error alleges the incorrection of finding No. 22, which reads as follows:

"The defendants, as an incentive for the sale of the lot and in making the offer of sale to the plaintiff, showed her the plan of the Garden City development approved by the Department of Health of Puerto Rico on November 12, 1926, and the plaintiff, induced by the development plan and believing and trusting that the streets would be constructed, purchased the lot."

Really, the evidence taken as a whole, even in the light most favorable to the plaintiff, does not support the preceding finding. Before the sale was executed plaintiff knew the land of the O'Neill brothers; she was always interested in said land as she stated in her letter of July 18, 1949 which she sent codefendant Luis O'Neill and in which she also stated that she did not purchase the land because the O'Neill brothers decided to keep the remainder for themselves and their relatives. —Plaintiff's Exhibit 9— The remainder included, of course, the strip drawn in the map of 1926, which would have been Street No. 5.

At the end of the year 1944 Mrs. Goenaga had already obtained her BS degree and had been a teacher in the high school of the University of Puerto Rico. At that time Act No. 213 of May 12, 1942 and Regulation No. 3 were in force, requiring the intervention of the Planning Board in the urbanizations, subdivisions and buildings as well as the inscription, filing and registration of every plan of development. The registry of property showed that the parcel of land of the O'Neill brothers had not been subdivided into blocks and streets, nor in the nineteen lots drawn in the plan of 1926, but that it was divided into the ten lots described in that registry and in the deed of sale executed in 1927 by Mr. Huyke in favor of the O'Neill brothers and that the 1926 plan had not been recorded. By that time it had been long since the approval of the municipality and of the department of the 1926 plan had lost its validity by virtue of Act No. 11 of 1931 and new plans, requirements, permits, and authorizations were necessary to make the urban subdivisions.

It appears from the evidence that on November 6, 1944 the O'Neill brothers gave Mrs. Goenaga an option of sale over a parcel of 1657.72 square meters of their property. In the 1926 plan that parcel corresponded to the lots of Block "B" marked with numbers 4, 5, 6, 7, 8, 9, and 10 according to the reference made thereof in the option of that plan. The

option expired January 6, 1945 without Mrs. Goenaga purchasing the parcel of land object thereof. This notwithstanding, at her request, the O'Neill brothers extended the period of the option for 60 days, that is, until March 7, 1945. Plaintiff's Exhibit 14. The extension expired and Mrs. Goenaga did not acquire the property.

Subsequently Mrs. Goenaga insisted on purchasing it. But then the O'Neill brothers were not willing to sell the 1657.72 square meters object of the extinguished option. They would only sell to her a portion of 1465.22 square meters, that is, 192.50 square meters less and this new parcel—which never appeared in the 1926 plan—was the property finally purchased by her. When she explained why she bought a parcel with a different area, she said:

"A. When I went to purchase all the lots from No. 4 to No. 10, inclusive, Mr. Luis O'Neill refused to sell me the entire land of lots 4 and 5. There remained a lot which according to him would be 6.25 lineal meters on the north and on the south. Then, I explained that we had an option under which he was bound to sell to me the entire lots Nos. 4 and 5 as well as all the other lots from No. 6 to No. 10. He refused and told me that he would not sell, that I would have to go to court if I wanted the lot. And that discussion, in which I insisted that he had to sell to me the whole of lots 4 and 5 and in which he refused to sell was prolonged from the time that I went to purchase until the signing of the deed on June 27, 1945, because I admitted that since there was an old friendship relation of many years and in order to avoid any more differences and since I did not want to go to court I decided to yield and buy only what Mr. O'Neill wished to sell me of lots 4 and 5, 6.25 lineal meters on the north and on the south. Then, the deed was prepared and I went to sign the deed..." (Tr. Ev. 23–24.)

At the execution of the deed of sale the 1926 plan was not shown to Mrs. Goenaga, notwithstanding the fact that the total area of lots 4 and 5 of Block "B" of the plan was not included in the new parcel which she acquired. From the transcript of the evidence we take the following:

"Witness, you have said that when you went to execute the deed to sign the deed you made certain statements because you noticed that the lots were not identified in the deed, that the lots connected with the option were not described, did you say that? I wish to ask you if when you signed the deed you had the plan of the alleged urbanization, did you have them before you?

"A. Mr. O'Neill had it; he was the one who showed the plan to me.

"Q. When signing the deed was the plan before you when you executed the deed?

"A. I do not remember. But I do not need it. I have quite a good memory.

"Q. I ask you if when you went to sign the deed and you noticed that certain specific lots which had been marked or described were not included, I ask you if at that moment you had the map there or not of what you were buying?

"A. I did not have it with me.

"Q. Did the notary have it?

"A. I do not know whether he had it in his desk or not.

"Q. At the moment of signing did you see it?

"A. At the moment of signing no. I had already seen the plan, I had studied it when I made the option of purchase. At that moment he had the plan with him.

"Q. You did not have the plan before you at the time of executing the deed?

"A. I did not need it. Prior to that option I had another option when the contract...

"Q. Did you have the plan present? ... Your answer is not responsive to my question.

"Judge:

"The witness answered that she does not remember whether or not she had the plan because she did not see it that day.

"A. I did not have it with me. The plan belonged to Mr. Luis O'Neill. I supposed that he had it. I did not need it because I knew what I was going to buy." (Tr. Ev. 42–44, Stenog. Cruz Cabrera.)

When codefendant Luis O'Neill testified with respect to the reason he had for making reference to the 1926 plan and to give as the northern boundary the nonexistent Street

No. 5, his explanation coincided with the hypothesis made by one of plaintiff's attorneys when the latter explained the possible reasons for the error of giving that street as the northern boundary. Mr. O'Neill testified with respect to this question:

"Q. Indeed? Well, now the question is why when you made the segregation of that parcel did you refer, upon fixing the boundaries of the parcel which you sold to Mrs. Goenaga, why upon fixing the boundaries did you mention some of the streets of the development, as, for example, Street No. 5?

"A. For the same reason that I wanted to insert everything in there, the map with the streets...

"Q. Why?

"A. I am telling you; I already told you. The reason why I wanted to include that description in the plan I have already told the court, because by doing so I called the attention of the Planning Board that that plan had existed, a plan approved by the Department of Health; and, further, in the event of a dispute it would serve the purpose of readily finding out without any trouble, how the matter was." (Tr. Ev. 220, Stenog. Salas.)

Without any doubt the 1926 plan was shown to Mrs. Goenaga some time before reaching a final agreement as to the purchase. She testified: "They showed me a plan when I made the offer of purchase." (Tr. Ev. 138, Stenog. Clavell.) The option to purchase the seven lots of block "B" was granted to her, as we have already stated on November 6, 1944 and the purchase was carried out seven months later, with respect to a parcel of land having a different area and without her having any need, as she testified, of the plan to know what she was acquiring.

She did not testify that the plan was shown to her "as an incentive for the sale" nor "was she induced by the urbanization designed in the said plan" to purchase; nor did she testify, nor does it appear from her testimony, that she purchased the lot "believing and trusting that the streets would be built"; nor did she testify that the O'Neill brothers bound themselves to construct Street No. 5; nor did she so allege

in her amended complaint. However, in the old plan which was shown to her at the end of 1944 the date on which it was prepared clearly appears: "September 14, 1926," and the date of its approval by the Municipal Assembly of Río Piedras: "October seven, 1926."

## IV

The twelfth and thirteenth assignments refer to findings of fact numbers 23 and 24, in which the trial court determined, essentially, that when plaintiff purchased the lot the occupants of the small slum and the persons who visited those dwellings used as an entrance and exit the land devoted to Street No. 5 and, "with said use and traffic the ground of Street No. 5 had become firm, making a path or an irregular trail" and it was still visible at the time of the inspection upon passing in front of the ruins of the houses which existed on those lots "as well as in front and all along the northern side of the lot purchased by the plaintiff."

Here again we agree with the appellants. We do not conceive how it can be concluded that a street 63.90 meters long by 13 meters wide exists and is paved on the basis that across the property there ran a small trail, road or narrow path as some of the witnesses called it, of about twelve or eighteen *inches* wide, of an irregular course, formed by the constant traffic of the residents of the small slum to go in and out their houses and by the public which could visit them. On the other hand, the evidence shows that that path did not run entirely along the proposed Street No. 5, and that it only touched on a certain point of the strip of land. According to the 1926 plan—plaintiff's Exhibit 3—the average distance between the northern line of the proposed Street No. 5 and the northern boundary of the parcel of land of the O'Neill brothers which is a concrete wall, that is, the rear of Block "D," was about 19.82 meters. During the inspection, the trial judge stated among other things: "...Mr. Carlos Fi-

gueroa, draftman, measured from the wall, that is, from the northern boundary of the property of the O'Neill brothers, 15 meters up to the trail." If, according to the plan, from the wall up to Street No. 5 there is an average distance of 19.82 meters, and if according to the inspection record, the "small trail" is only 15 meters away from the wall, that is, that between that "small trail" and the border or northern line of the proposed Street No. 5 there existed a strip of land 4.82 meters wide, it is impossible to conclude (1) that due to the use and traffic along that "small trail," the street was firm, and (2) that that "small trail" was perceptible "in passing . . . in front and all along the northern side of the lot purchased by the plaintiff." [9a]

The traffic through the property by the residents of the slum as well as by the public which visited them was a transitory act merely tolerated by the O'Neill brothers. Not even the existence of the slum nor the use of those lands were permanent. With the removal of those small houses the traffic disappeared, as indicated by a majority of the photographs admitted. Plaintiff's attorneys filed a motion on June 2, 1961, in which they so admit when they say:

"Because in the year 1953, date of the filing of the complaint, all the houses of Street No. 5 had been destroyed and therefore, the occupants of those properties did not go through those lands, an additional reason why the witness did not find in 1959 any trace of Street No. 5."

[9a] In making this finding, the trial court, without apparent reason, rejected the uncontroverted testimony of engineer Noel Piñero, who upon being asked: Can you tell the court if that narrow trail shown here in the picture falls within the lots of the O'Neill brothers, or if it falls within the zone destined in the plan to Street number five?

"A. Well, I could assure that where the road starts or where that trail began in the northern part up to where the houses were, it does not touch street number five at any point. Probably, and I wish to say it in all honesty, probably from this house here as it goes out in an irregular form, well, perhaps at some point where it came out it touched part of the street, but I do say that this northern part was no part of the street." (Tr. Ev. 80.)

194

■ Even assuming that those findings of fact are correct, that is, that the whole strip of 615.10 square meters drawn in the 1926 plan under the name "Street No. 5" had been used by those residents and by the persons who visited them with the consent of the O'Neill brothers, it can not be determined at law that a real right of way was created over that strip and in favor of the lot sold to the plaintiff. In a number of cases we have held that the mere permit granted by a property owner to go across his property or his tolerance to that effect is not sufficient to create a servitude of right of way which may only be acquired by virtue of title.[10]

■ Nor could it be determined, on the evidence presented, that there undoubtedly existed or was produced an implied dedication of the land for the general use of the public by specific activities and conduct of the O'Neill brothers and which might have placed them in a position of being estopped from denying that dedication. Besides the fact of having tolerated for some time the path across their land, we have not found in the record a single action on their part which reveals the specific and indubitable intention of dedicating the strip of land drawn in the 1926 plan as Street No. 5, for the general use of the public, and much less of constituting a servitude of right of way, light, air and view— as decreed by the judgment—in favor of the tenement of Mrs. Goenaga.

■ We indicated in *Figueroa v. Guerra*, 69 P.R.R. 565, 569 (1949):

"However, implied dedication is a doctrine which must be invoked cautiously in this jurisdiction, where even private rights of way, except where prescription based on use since

---

[10] *Martín v. Correa*, 76 P.R.R. 11, 13 (1954); *Pabón v. Ayala*, 71 P.R.R. 878, 881 (1950); *Figueroa v. Guerra*, 69 P.R.R. 565, 569 (1949); *Cabanillas v. Gelpí*, 65 P.R.R. 890 (1946) and cases cited at p. 891 of this last case. See §§ 283, 391, 392, 475, 476, and 1232 of the Civil Code, 1930 ed.

time immemorial began to run prior to 1889, may be created under § 475 of the Civil Code only by deed." [11]

In its conclusions of law the trial court stated:

"The lot acquired by the plaintiff was recorded as being bounded on the north by Street No. 5, according to report L-692 of March 8, 1946 issued by the Board. The court is of the opinion and understands that the strip of land intended for Street No. 5 was reserved and devoted to the construction of a street or public thoroughfare, and that by virtue of this reservation and registration, plantiff's lot acquired real rights over the strip devoted to a street, the property of the plaintiff constituting the dominant tenement and the strip destined to a street or public thoroughfare becoming the servient tenement. (See recent order of our Supreme Court in the case of *Gerardo Baldrich et al.* v. *Registrar of Property,* decided December 29, 1954.)"

We have already said that the error in designating the proposed Street No. 5 as northern boundary of the lot of the plaintiff was due, as honestly and spontaneously stated by one of the distinguished counsel, not to an act of the O'Neill brothers but to an error of the notary who drafted and authorized the deed of reconsolidation, segregation and sale. From Exhibit 12 of plaintiff herself, which is an Order of the Planning Board of January 13, 1954, it appears that "the description of the property acquired by the petitioner (Mrs. Goenaga) according to the report in case 346 subd. ñ was copied from the deed . . ." in other words, the error committed by the notary was repeated by the Board in its report.

The plaintiff can not consider that a servitude was created in favor of her tenement because she recorded in the registry the deed of sale in which it was stated that her parcel was bounded on the north by Street No. 5. In the first place, because, in that same deed, quoting one of her attorneys who spoke "in honor of the truth":

---

[11] See the commentaries in 19 *Rev. Jur. U.P.R.,* 47–58 (1950) as to the case law, up to that year, on the matter of dedication.

". . . there was no division of that large parcel [the one formed by reconsolidation of the 10 lots of the registry and of the title—not of the 1926 plan—of 1927 of the O'Neill brothers] into streets and lots. Your Honor knows that to be logical the large parcel should have been divided into blocks and streets and lots, but it does not appear from said deed that the big parcel had been divided into blocks, streets and lots. Then, of course, the segregated parcel could not be divided into blocks and streets and lots. It did not exist for the purposes of that deed, and that is the juridical point." (Tr. Ev. 46, Stenog. Salas.)

▆▆▆▆ In the second place, the registration of the contract of sale did not cure the "error committed by the notary." We have held that, save for a mortgage right, registration is only a declaration and not a source of rights, nor a means of acquiring them, but a way to secure legally those already existing, which does not wipe out the vice or error in the act or contract which caused it, nor supplies title nor renders effective what is void nor gives life to what was lifeless from its birth.[12]

The doctrine laid down in the *Baldrich* case is not applicable to this case. We held therein that we could not order the registrar, at the request of only one of the urbanizers, to cancel the restrictions recorded, limiting to commercial and recreational uses only certain lots of an urbanization already constructed and developed and sold in part in residential lots, because those reservations, restrictions or limitations on the use of those specific lots, which had been expressly included in the saving clauses of the deeds which were object of the corresponding registrations, insofar as they were beneficial to all the other residential lots, constituted real rights in favor of those residential lots. There is no clause in the deed of sale to Mrs. Goenaga as to the future use of the whole or part of the remainder of the main property, nor were any reservations, restrictions or limitations established as to said

---

[12] *Baldrich* v. *Registrar*, 77 P.R.R. 700, 705 (1954); *Jiménez* v. *Alvarez*, 69 P.R.R. 299, 308 (1948); *Pérez* v. *Montañez*, 45 P.R.R. 21, 26 (1933); Art. 33, Mortgage Law.

remainder.   The description of the parcel was made in the deed for the sole purpose of its identification, to indicate the object of the contract.   It would have been very easy for the executing parties if they had so agreed, to state them in the deed of sale, or in the explanatory deed which was later executed before notary, or in any private document executed by them.

The only reservation which seems to have been made with respect to the remainder of the parcel is the one admitted by plaintiff herself in her letter of July 18, 1949, copied above, in that part where she says: "Your wife Pepita was interested in withholding that land for you and some relatives."

## V

The fourteenth assignment refers to finding of fact No. 27, in which it is determined that Street No. 6 had curbs running into Street No. 5.   This error is unimportant for even admitting that it did have, there was no proof as to the person who made those curbs.   There was no proof either that the O'Neill brothers constructed any of the proposed streets in the plan.   O'Neill Street had been built by Mr. Huyke; No. 4, by several residents.   The appellants state in their brief that Street No. 6 was built by Jorge Rosario and that the trial judge refused, on certain technicalities, to admit his testimony to that effect and also "to admit and examine the plan of the adjoining owner Arturo Ocasio, approved by the Planning Board and filed in the registry of property.   That plan shows Street No. 6 without any entrance to the alleged Street No. 5."   They also state—without it being supported by any evidence presented to the trial judge before he rendered his judgment—that "it is a matter of record of the Planning Board that that Street No. 6 was constructed without any relation to the alleged Street No. 5." In its report of June 13, 1956, confirming its Addenda to Report 1–14,517 (Plaintiff's Exhibit 12), the Board states:

"10. That Street No. 6 was built in 1939 with complete disregard of Street No. 5, for its curbs were constructed in a straight and continuous line showing, in our opinion, that said Street No. 6 was not constructed with a view to establishing any connection or continuity with the aforesaid Street No. 5."

## VI

In the remaining three assignments concerning the findings of fact, the appellants attack Nos. 28, 29 and 30. In those findings the trial court held: The Planning Board accepted Streets Nos. 4 and 5 in subdividing the property of the defendants, describing the lot sold to the plaintiff as being bounded by said Streets 4, 5 and O'Neill; that said Board "subsequently to the subdivision of the lot sold to the plaintiff" admitted and accepted the Garden City development by approving and subdividing subsequent segregations and that the Board at the request of the defendants, without notifying plaintiff or making her a party, approved the subdivision of the remainder of the parcel of land of the O'Neill brothers into two lots which are described in the eighth paragraph of the amended complaint "said Board disregarding and ignoring its report L-692 of March 8, 1946, when it subdivided the lot sold to plaintiff as being bounded on the north and west by Streets Nos. 4 and 5..."

The last four findings of fact Nos. 31, 32, 33, and 34 are not challenged by the appellants. Number 31 refers to the sale of one of the two lots to Banco Popular; No. 32 refers to a warning made by the defendants to the plaintiff that Street No. 5 had been eliminated and that no one had any right of way over it; No. 33 states that plaintiff appeared before the Board and requested the amendment or nullity of Report L-14,517 of March 18, 1953; and No. 34 that defendants forbade the plaintiff to travel along Street No. 5 and denied her every right to said street.

Finding No. 28 which states that the Planning Board accepted Streets Nos. 4 and 5 in subdividing the property

of the defendants, describing the lot sold to the plaintiff as being bounded by streets 4 and 5 and O'Neill is hardly supported by the evidence presented; although it is seemingly correct, because it is true that when the Board approved in 1945, in case 346 subd., the segregation of the lot sold that year to Mrs. Goenaga, the Board described it with those boundaries and with the main property on the eastern boundary. And as we have stated several times, the error of the notary was again repeated. The reason was, as decided by the Board itself, that the description of the lot was taken from the deed of sale, as revealed by plaintiff's Exhibit 12, that is, the Order of March 13, 1954, which reads in part:

"5. That the description of petitioner's property, according to the deed of sale, upon referring to its northern boundary reads as follows 'by proposed Street No. 5.'

"6. That the Board in approving the subdivision in case 346 subd., refers to the northern boundary as follows 'by Street No. 5.'

"7. That the description of the property acquired by the petitioner according to the report in case 346 subd., *was copied from the deed* and by omission the word 'proposed' was not included.

"8. That the owners of the property reconsolidated in the deed of sale have never assumed, as to the regulations and decisions of the Board, the obligation to build the aforesaid Street No. 5.

".    .    .    .    .    .    .    .

"11. That pursuant to the best technique of urbanization the construction of said Street No. 5 seriously affects the best urban development of the area.

".    .    .    .    .    .    .    .

"13. That petitioner's lot has two fronts (O'Neill Street, formerly No. 1, and Street No. 4).

"14. That the Board in approving the formation of petitioner's lot (Case 346 subd.) indicated 'that this lot has the minimum facilities.'

200

"15. That the Board has never stated that the reason for approving the segregation of petitioner's lot was that 'since said plan was previously approved by the Department of Health of Puerto Rico, prior to the effectiveness of the Planning and Subdivision Act of 1942, said Planning Board approves the preceding segregation' as stated in the deed of segregation.

"16. That in the deed of sale the petitioner bound herself 'to comply with the Board's requirement as to the *construction of sidewalks in front of the lot that she hereby acquires*' (italics ours).

"17. That this Board did not require the building of sidewalks or any work in connection with Street No. 5.

"18. That this Board, if it had considered that said Street No. 5 was part of the development of the area, would have required its construction in case No. 346 subd.

"19. That this Board has never considered that the construction of Street No. 5 is either convenient or necessary.

"20. That this Board required sidewalks in front of the lot to be segregated (Case 346 subd.) and did not include in its requirements the construction of sidewalks in front of Street No. 5.

" .          .          .          .          .          .          .          .

"22. That Street No. 5 has been under the direct control of Messrs. O'Neill and a part of a single body of land with the rest of the property.

"23. That Street No. 5 *has never been open to the public and has never been used as a street*.

"24. That urbanizations prior to the approval of the Planning Regulation No. 3 (Subdivision) were governed by Act No. 11 of 1931.

"25. That in the urbanization of this land the provisions of Act No. 11 of 1931 were not complied with.

"26. That the subdivision plan prepared prior to the effectiveness of Planning Regulation No. 3 (Subdivision) *were only used as guides and were not binding in the least as to the formation of the lots particularly as to area, shape and dimensions*.

"27. That for the land object of this case the parcel of land was not approved by the competent authorities *as urbanized*.

"28. That since the urbanization was not approved as completed by the competent authorities the proposed plan is rendered void.

"    .        .        .        .        .        .        .        .

"31. That the reconsolidation of the parcels of land into a single area executed in the same deed of sale of the parcel acquired by the petitioner does not refer to Street No. 5 nor does the description of the lots which were reconsolidated." (Italics ours.)    (Tr. Ev. 154–157, Stenog. Clavell.)

■■■■ The appellee sets forth in her brief—p. 36—that that Order of the Board was "set aside by this Court by Order of April 8, 1954." We have examined our order. The action we took there was to dismiss, as premature, the petition for review filed with respect to the aforesaid order of January 13, 1954 issued by the Board. We stated, however, that the Board would hear the petitioner on the questions involved in that order, and that "we assume that the Board shall set aside said conclusions and then after hearing the pertinent evidence it shall render whatever order it deems appropriate on the basis of new findings of fact and conclusions of law."

■■■■ Appellee has not proved that the Planning Board finally and actually proceeded to set aside those conclusions. We would have reached almost all such conclusions without the aid of that order.[13]

By conclusion No. 29 the trial judge determined, in brief, that the Board "admitted and accepted Garden City development by approving and subdividing subsequent segregations" of lots which composed Block "C" of the 1926 plan.

---

[13] On May 29, 1961—more than two years after this petition was submitted for decision—the appellants filed a motion to consider three orders of the Planning Board, rendered in case 12,208 subd.—for the division of the remainder of the parcel of land of the O'Neill brothers in two parcels—one of June 13, 1956, another of May 15, 1957, and the last one of December 9, 1959. Appellee timely objected to this motion essentially because those three orders were not presented in evidence in

According to plaintiff's Exhibit 4, the O'Neill brothers segregated, by deeds executed on July 27, 1946 and August 30, 1949—much later than the sale in favor of Mrs. Goenaga —five lots from their land which in the 1926 plan composed Block "C" of the proposed Garden City development. To do so they had to obtain first, and did obtain—according to said Exhibit 4—the approval of the Planning Board, just as they had to obtain it in order to sell the lot of Mrs. Goenaga in 1945. Upon describing each one of the five lots, they stated that it was number so and so, with so many square meters, situated in Block "C" of the Garden City development in Hato Rey, Río Piedras, and gave their dimensions. All these descriptive facts coincided with the date of the five lots of Block "C" of the platted development according to the 1926 plan. Positively, this plan served as a guide for the O'Neill brothers to request, and for the Planning Board to approve and authorize, those segregations, particularly as to the identification or description of those lots. If there had existed a developed urbanization, made and constructed in due time pursuant to the 1926 plan, approved by the authorities prior to the Board, and recorded in the registry of property, with respect to the entire parcel of the O'Neill brothers, there would have been no need to request the approval of the Board for those segregations.[14]

---

the course of the proceeding in the trial court, nor weighed or considered by the trial judge in rendering the judgment appealed from and, furthermore, because those orders were not final "since an appeal therefrom was pending." At this stage of the proceedings it was inappropriate to take said orders into consideration and we would have committed a grave injustice towards the trial judge in having considered them in the determination of the case. Of course, any leave to present those orders should be considered denied.

[14] Cf. Alicea v. Registrar, 71 P.R.R. 554, 560 (1950); Wilcox v. Registrar, 67 P.R.R. 445, 450 (1947), and Matos v. Planning Board, 66 P.R.R. 417, 419 (1946)—§§ 21 and 24 of Act No. 213, above cited.

The proposed Street No. 5 appears to be laid out outside Block "C" in the plan. It was not a part of that block. It would have only separated Block "B" from "D." Three of those five lots of Block "C" have their main entrance on O'Neill Street and two on Street No. 4, which was built by a number of residents after the sale to plaintiff. Neither the approval by the Board of the segregation of the lot sold to the plaintiff nor the approval of subsequent segregations may be considered any title to a right of way or to any servitude.

It is true that in the year 1953, as stated by the trial judge in his finding of fact No. 30, the O'Neill brothers requested the Planning Board, without notifying Mrs. Goenaga, the approval of the division into two lots of the remainder of 3,000.964 square meters of the parcel purchased by them in 1927 from Mr. Huyke and that said Board, without hearing the adjoining owner, Mrs. Goenaga, approved the proposed subdivision by order of March 18, 1953, wherefore it was divided into two lots. One of them, lot marked "A", has an area of 1,820.289 square meters, it is situated at the end of the original parcel, and according to its metes and bounds it appears bounded "on the south, along 31.90 meters, by lot 'B' of the main property described below and along approximately 32.00 meters by Mrs. Conchita Goenaga;..." Its main exit is towards Muñoz Rivera Avenue, having another exit on the west, for a length of 11.595 meters, to Street No. 4. The other lot, marked "B", has an area of 1118.675 square meters, on the corner of Muñoz Rivera Avenue and O'Neill Street and it is bounded on the west by plaintiff. This lot "B" was sold to the Banco Popular. But neither Act No. 213 nor Regulation No. 3 require that

notice of a petition for subdivision be served on the adjoining owners. It suffices, as provided by Art. 4 of that Regulation, that the declaration of intention to subdivide be made by the person interested in making such subdivision "in the form provided by the Board" and "submit it to the Secretary of the Board."

Article 17 of Regulation No. 1 merely required that the Board notify its resolutions to the person who appears as "the party directly interested according to the documents filed in the case." Mrs. Goenaga appeared in the case on June 12, 1953, three months after the subdivision was approved, seeking that the description of lot "A" withheld by the O'Neill brothers be amended with respect to its southern boundary and that it be made to appear as bounded by Street No. 5 and not by her lot; she maintained that the strip of Street No. 5, according to the 1926 plan, was a public street over which she had a right of way and the land which enclosed it was not part of lot "A".

The Planning Board heard Mrs. Goenaga at length. Thereafter it issued the order of January 13, 1954, to which we have already referred. As we have seen, she had no legal basis to obtain the amendment or alteration in the southern boundary of the new lot "A" of the O'Neill brothers in the fashion she requested.

Here ends our analysis and examination of the conclusions challenged. In vain we have searched for reasons of fact and of law sufficiently appropriate to support the conclusions and the judgment of the trial court.

As stated by the plaintiff the essential fact in controversy was the existence of Street No. 5 at the time the plaintiff

purchased the lot "and if it did not exist, whether there was a servitude." The performance of the contract was requested "as to opening the street or respecting the servitude." (Tr. Ev. 3–4, Stenog. Clavell.) The judgment was mistaken because as a matter of fact and of law Mrs. Goenaga never held the necessary title to establish the alleged right of way in her favor.

■■■ The main source of the juridical relations between the parties is the contract of sale executed on June 27, 1945. By virtue of this contract the O'Neill brothers merely sold to Mrs. Goenaga a lot measuring 1465.22 square meters, which was segregated by the same deed from the parcel of land of 5,927 square meters purchased by them from Mr. Huyke,

"... granting the present title as transfer of ownership, possession, and whatever rights are held by them or their attorneys in fact *over the parcel of land already described and object of this sale...*" (Italics ours.)

Those were all the rights that they conveyed to the plaintiff. They never bound themselves, either principally or accessorily, to constitute, create, grant, recognize, or respect any real right of way or of any other servitude over the whole or part of the remainder of the principal parcel as a servient tenement and in favor of the lot sold to the plaintiff as dominant tenement. The only restrictions or conditions stipulated in the document are those imposed on or assumed by Mrs. Goenaga not to construct frame buildings, nor "factories making undesirable noises, nor throwing particles into the air vitiating the same," binding herself "to comply with the requirement of the Planning Board concerning the construction of sidewalks *in front of the lot which is hereby*

*acquired."* According to the explanatory deed executed by them some days later, the Planning Board also imposed as a condition for the approval of the segregation the absolute prohibition to erect or construct any building on the lot segregated at a distance of less than four meters from the curb, to the north of O'Neill Street.

■ We have decided that once a development plan is laid out on a land divided into blocks, streets and lots, the urbanizer is estopped from denying the use of the streets laid out and constructed to the purchasers of the lots, as well as the right of the latter to use the streets laid out not only against the urbanizer but also against any other person who limits and impairs the use and enjoyment of said streets.[15] However, this case law is based on the premise that there exists a true and real development. We know that when the sale was executed there was not a single meter of land urbanized and that the 1926 plan had lost its force and effectiveness as a development plan.

The O'Neill brothers complied with their obligation of materially delivering the lot to Mrs. Goenaga. The latter built her needlework factory thereon in 1946, with ample fronts and exits to O'Neill Street and Street No. 4. To go in and out of her property she has no need to go across the property of the O'Neill brothers. Up to March 1953 she had claimed no right of way over that land.

■■ The mere existence of the path, trail or irregular road that had been formed on that land by the traffic of the people living in the slum does not constitute "any apparent sign of servitude" between the lot purchased by the plaintiff

---

[15] *Ferrer* v. *Varela,* 71 P.R.R. 70, 74–75 (1950); *Capella* v. *Carreras,* 48 P.R.R. 811, 820–21 (1935).

and the remainder of the main property, *"established by the owner,"* as provided by § 477 of our Civil Code.[16]

Neither the deed of sale nor the conduct or acts of the O'Neill brothers, prior or subsequent to the contract or during its execution, indicate in any way the desire, willingness, or intention on their part to devote or dedicate any strip of land to public use.

The convenience or comfort for the plaintiff to endow her property gratuitously with a larger area of construction, as a result of the newly-formed corner at the so-called Street No. 5, increasing the market value by twenty per cent (20%) —Guillermo Bermúdez, the real estate broker, assessed plaintiff's lot in 1954 at $40 and $45 per square meter, Tr. Ev. 131, Clavell—9 years before she had purchased it at $3 per square meter—Tr. Ev. 57, Clavell—can not be classified within the category of a real right of servitude over the property of the adjacent owner.

It is not fair to compel, without a clear right to do so, an adjacent property owner to permanently and gratuitously encumber his land in 33% of its area with a "servitude of right of way, light, air, and view," which substantially reduces its area of construction—if he is actually permitted to build in the unaffected portion—and which deprives him of the unrestricted use of the only exit on the west side—the servitude decreed is 13 meters wide and the exit in the west side to Street No. 4 is only 11.595 meters. See Appendix.

The judgment appealed from will be reversed and another rendered instead dismissing the amended complaint in all its parts.

---

[16] We held in *Toa Sugar Co.* v. *Galán et al.*, 28 P.R.R. 791, 798 (1920), that the mere existence of some trails with their ramifications and the more or less intermittent use thereof does not constitute sufficient notice of a right of way, and in *González* v. *Fernández*, 49 P.R.R. 28, 30 (1935), that the sign to which that section refers must be permanent, not variable, nor accidental.

—North—

Dividing Wall

Dividing Wall (Formerly slum)

Lot "A"
Subd. 1953
O'Neill Brothers

1820.289 sq. m.

31.917 m.

11.595 m.

10 m.

Strip for proposed street No. 5

615.10 sq. m.    1926 Plan

36.90 m.

Mrs. Goenaga's lot

1,467.96 sq. m.
Subd. 1945

Concrete
bldg.
constructed
by Mrs. Goenaga
for her factory

40.50 m.

38.50 m.

Lot "B"
Subd. 1953
1,118.675 sq. m.

(today Banco
Popular)

Street No. 4

37.50 m.

O'Neill Street

South

Sketch of the three lots
existing after the last
subdivision and of proposed
street No. 5.